**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Anthony Chiaro,<br><br>   Plaintiff,<br><br>v.<br><br>City of Tempe, et al.,<br><br>   Defendants. | No. CV-25-01968-PHX-ROS<br><br>**ORDER** |

  Before the Court is Defendants' Motion to Dismiss Count One of the First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6).[1] (Doc. 10.) Plaintiff filed a Response, (Doc. 13), and Defendants filed a Reply, (Doc. 14). For the following reasons, the Court will grant Defendant's Motion to Dismiss and dismiss Plaintiff's First Amended Complaint ("FAC") with leave to amend.

**I. BACKGROUND[2]**

  Plaintiff Anthony Chiaro was employed as a police officer with the Tempe Police Department ("TPD") from September 18, 2000, until his retirement on January 9, 2024. TPD is overseen by the City Manager for Defendant City of Tempe, Defendant Rosa Inchausti, who has served as City Manager since June 27, 2023, after previously serving as Deputy City Manager. Beginning in 2012, Plaintiff was assigned to TPD's Technical Services Unit ("TSU"), where he was involved procuring, training, and deploying software

---

[1] Despite the title of their Motion to Dismiss, Defendants move to dismiss both Count One and Count Two.
[2] The factual background is adopted from Plaintiff's First Amended Complaint. (*See* Doc. 1-1 at 63–88.)

and hardware for all TPD personnel.

On April 19, 2023, Plaintiff called then-Deputy City Manager Inchausti to report various ways in which he believed TSU's projects and functions were being "stalled or undermined," primarily by two civilian supervisors with TPD, Miyoung Kim and Wil Price. Sometime in late April after his complaint to Inchausti, Kim—in coordination with Amanda Bunger, who worked with Kim in TPD's records department—covertly altered Plaintiff's visibility and access to AxonEvidence.com ("Axon").

Plaintiff filed a "Safe Haven" complaint[3] on May 16, 2023, with the City's Diversity Director Dr. Velicia McMillan Humes, largely repeating the prior allegations against Kim and Price.[4] Dr. Humes said she would brief the City's HR Director Rebecca Strisko on Plaintiff's complaint, but when Plaintiff emailed Dr. Humes on August 27, 2023, to follow up on his unresolved complaint, she did not respond.

Following his Safe Haven complaint, Plaintiff alleges a serious of retaliatory acts. In June or July 2023, the City denied Plaintiff's request to attend a three-day training conference after having attended similar training conferences almost every year since joining TSU.

In June 2023, Plaintiff was unable to fulfill a request from the Phoenix Police Department for body camera footage after his Axon access had been restricted by Kim and Bunger. Although TSU did not routinely handle such requests from external agencies, TSU frequently covered them given delays with TPD's Records Bureau. Plaintiff's supervisor, Rodney Collazo, later fulfilled this request upon returning to office.

On June 22, 2023, Price formally notified Plaintiff he was the focus of an internal investigation concerning TSU's provision of body camera footage to the Phoenix Police Department, Plaintiff conducting an audit on Kim's Axon usage, and an allegation that

---

[3] The Safe Haven program was implemented to "encourage employees to submit grievances, reports and suggestions to the City without fear of reprisal." (Doc. 1-1 at 69.)
[4] Plaintiff asserts his Safe Haven complaint alleged "retaliation" by Kim and Price for having complained to Inchausti, but the FAC largely alleges Kim and Price took actions that negatively affected the TSU as a whole. Though TSU "at times was comprised solely by Chiaro," (Doc. 1-1 at 66), this seemingly was not one of those times, as the misconduct allegedly affected "the remaining TSU personnel including Chiaro," (*id.* at 69).

Plaintiff contributed to a hostile work environment. Plaintiff protested that Price had previously retaliated against him, so TPD assigned the investigation to Defendant Erik Hernandez, an internal investigations detective with TPD. Pursuant to TPD's investigation, Plaintiff was then placed in a restricted system classification which limited his administrative capabilities and restricted him to basic hardware assignment tasks.

On August 14, 2023, Plaintiff and Ian Alevizon, his TSU coworker, met with Defendant Inchausti and Deputy City Manager Greg Ruiz to formally present a timeline of "project sabotage, system failures, and retaliation" within TSU. After noting the complaints were valid, Defendant Inchausti responded to the presentation by stating she would not act on their disclosures.

Beginning on August 28, 2023, Plaintiff took leave under the Family and Medical Leave Act. Plaintiff thereafter retired from his position with TPD on January 9, 2024. In the customary farewell email sent out to all TPD employees, Assistant Chief of Police James Sweig incorporated an "unusual additional statement" reminding that retired TPD employees are prohibited from entering TPD facilities without a supervisor's approval.

On January 22, 2024, Defendant Hernandez submitted a peace officer termination report, which Arizona law mandates after both voluntary and involuntary terminations. These reports require certain information to be provided, "including any misconduct or discipline arising from or during employment." In Plaintiff's termination report, Hernandez noted "misconduct" was involved in Plaintiff's termination even though the investigation into Plaintiff had not formally concluded. Following his retirement, Plaintiff intended to apply for open positions with the Gilbert Police Department and the Arizona Department of Transportation; however, he did not apply after he was informally advised that the misconduct allegation in his termination report would disqualify him from the positions.

On August 21, 2024, seven months after Plaintiff retired from TPD, Assistant Chief Sweig issued a report concluding the internal investigation into Plaintiff and noting, had Plaintiff not retired, the recommended disciplinary action would have been two written reprimands.

## II. LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted)). If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint" has not adequately shown the pleader is entitled to relief. *Id.* at 679. Although federal courts ruling on a Motion to Dismiss "must take all of the factual allegations in the complaint as true," they "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted).

"To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

## III. ANALYSIS

### A. Count One – Defendants Inchausti and City of Tempe

In Count One, Plaintiff asserts a § 1983 claim against both Defendant Inchausti and the City of Tempe ("the City") for the alleged retaliation he suffered for his internal complaints in violation of his First Amendment rights. To state a § 1983 First Amendment retaliation claim, Plaintiff must show "(1) he was subjected to an adverse employment action, . . . (2) he engaged in speech that was constitutionally protected because it touched on a matter of public concern and (3) the protected expression was a substantial motivating factor for the adverse action." *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 976 (9th Cir. 2002) (citing *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000)).

### 1. Defendant Inchausti

Defendants argue Count One fails as to Defendant Inchausti "because the FAC does not allege that she personally participated in any of the alleged retaliation," (Doc. 10 at 4), nor does the FAC "plausibly allege that Inchausti's alleged subordinates themselves engaged in unconstitutional retaliation," (Doc. 14 at 2).

There is no respondeat superior liability under § 1983. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). However, a supervisor may be personally liable under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (citation omitted). A sufficient causal connection exists where a supervisor "set[s] in motion a series of acts by others" or "knowingly refus[es] to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207–08 (citation modified).

To support Plaintiff's § 1983 claim against Defendant Inchausti, the FAC alleges: (1) "Inchausti was the Tempe City Manager and ultimate chief executive of the city government with supervisory authority over the police department," (2) Chiaro made his first and third complaints directly to Inchausti, and his second complaint was passed on to Inchausti from Dr. Humes, and (3) "Inchausti told Chiaro and others in a meeting that she would not follow up or do anything about the police department problems and failures" reported to her by Chiaro. (Doc. 13 at 4–5.)

The parties dispute whether the FAC alleges a sufficient causal connection between Inchausti's refusal to do anything about the problems and a subsequent violation of Plaintiff's First Amendment rights. Plaintiff cites *Preschooler II v. Clark County School Board of Trustees*, 479 F.3d 1175, 1182 (9th Cir. 2007), asserting the Ninth Circuit "held that specificity as to how each defendant contributed to the violation of constitutional rights was not required at the pleading stage." (Doc. 13 at 6.) As Plaintiff notes, in that case the Ninth Circuit cited *Hydrick v. Hunter*, 466 F.3d 676, 689–90 (9th Cir. 2006), to suggest

specificity was not required—but *Hydrick*'s holding is not good law after the Supreme Court vacated and remanded it for reconsideration in light of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

The plaintiffs in *Hydrick* pled a supervisor had notice of the unconstitutional conduct of his subordinates, and—as the Ninth Circuit originally held—the factual allegations in the complaint "plausibly suggest[ed] that [the supervisor] acquiesced in the unconstitutional conduct of his subordinates" because there was no "obvious alternative explanation" for the supervisor's inaction. *Id.* (quoting *Hydrick*, 466 F.3d at 1216). But on remand, the Ninth Circuit found these conclusory allegations were insufficient to establish individual liability against the supervisor: "Even under a 'deliberate indifference' theory of individual liability, the Plaintiffs must still allege sufficient facts to plausibly establish the defendant's 'knowledge of' and 'acquiescence in' the unconstitutional conduct of his subordinates." *Id.* at 942 (quoting *Starr v. Baca*, 652 F.3d 1202, 1206–07 (9th Cir. 2011).

Here, conclusory allegations that Inchausti "orchestrated, ratified, and encouraged the retaliation," (Doc. 1-1 at 80), are insufficient to establish her individual liability. But, unlike in *Hydrick*, here the FAC still alleges sufficient facts to plausibly establish Inchausti's knowledge of and acquiescence in the conduct reported to her. Rather than there simply being no "obvious alternative explanation," Inchausti is alleged to have expressly stated she would not do anything to address the conduct.

But critically, the FAC fails to plausibly establish Inchausti's knowledge and acquiescence *caused* any constitutional injury. Apart from conclusory allegations that Inchausti "orchestrated, ratified, and encouraged the retaliation," the FAC fails to allege any retaliators—whether Kim, Price, or others—even had knowledge of Plaintiff's protected complaints. Furthermore, the FAC establishes the timing of Inchausti's acquiescence upon Plaintiff's third complaint, which occurred *after* most of the alleged retaliation.[5] As such, the FAC does not establish Inchausti set in motion or knowingly

---

[5] The only alleged incidents of retaliation following Plaintiff's third complaint occurred after he decided to retire: the "unusual" retirement email from Assistant Chief Sweig, and the termination report from Defendant Hernandez. (*See* Doc. 1-1 at 14–17.) Neither Sweig nor Hernandez allegedly committed other retaliation, so it is difficult to conclude Inchausti

refused to terminate a series of acts by others she reasonably should have known would cause others to inflict a constitutional injury.[6]

Because the pleading might be cured by the allegation of other facts, the Court will dismiss Count One against Defendant Inchausti with leave to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc).

### 2. Defendant City of Tempe

To state a *Monell* claim against a municipality under § 1983, a plaintiff must demonstrate that an "official policy, custom, or pattern" of the government entity was "the actionable cause of the claimed injury." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022, 1026 (9th Cir. 2008)). "In particular, municipalities may be liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Williams v. City of Sparks*, 112 F.4th 635, 646 (9th Cir. 2024) (quoting *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019)). "A plaintiff must show deliberate action attributable to the municipality that directly caused a deprivation of federal rights." *Id.* (citation modified).

Defendants argue Plaintiff has failed to state a *Monell* claim against the City of Tempe because "the FAC does not plausibly allege an underlying constitutional violation," nor does it "plausibly allege long-standing and persistent policy or custom of constitutional violations by the City sufficiently similar to the alleged facts in Plaintiff's FAC" or that the City is liable by virtue of Defendant Inchausti's position as city manager and policymaker.

---

acquiesced in their future conduct.

[6] Plaintiff alternatively suggests "Inchausti may have *official capacity* liability as a 'policymaker' as well," (Doc. 13 at 6), but this simply restates Plaintiff's *Monell* claim against the City of Tempe. *See Butler v. Elle*, 281 F.3d 1014, 1023 n.8 (9th Cir. 2002) ("Section 1983 claims against government officials in their official capacities are really suits against the governmental employer because the employer must pay any damages awarded." (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985))); *see also, e.g.*, *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1114 (E.D. Cal. 2012) ("Where both the public entity and a municipal officer are named in a lawsuit, a court may dismiss the individual named in his official capacity as a redundant defendant." (citing *Hernandez v. City of Napa*, 781 F. Supp. 2d 975, 1001 (N.D. Cal. 2011))).

(Doc. 14 at 6–8.) Plaintiff contends municipal liability may be shown under all but the "official policy" exception. (Doc. 13 at 7.) The Court examines each of the other three exceptions in turn.

### a. Pervasive Practice or Custom

Under this exception, in the absence of a formal governmental policy, a plaintiff must show a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)). "The custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Id.* (quoting *Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 691 (1978)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* (citing *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984)).

Plaintiff alleges "[t]he City of Tempe has a longstanding practice or custom . . . of punishing and retaliating against its employees who engage in First Amendment protected exercise of their rights of Free Speech and Petitioning the Government for a redress of grievances which the City does not agree with, or finds objectionable or critical." (Doc. 1-1 at 80.) To support this assertion, Plaintiff points to fifteen incidents involving alleged retaliation against the City's employees between about 2002 and 2023. (*See id.* at 81–85.) From the few details provided, most of these incidents appear largely unrelated to Plaintiff's allegations, instead concerning retaliation for complaints of discrimination, hostile work environment, or various whistleblower complaints.[7]

Defendants argue Plaintiff's examples of other alleged retaliation are insufficient because they are not "sufficiently similar" to establish the City's practice of retaliating for

---

[7] Of the fifteen incidents, only three appear to involve similar retaliation after complaints of mismanagement in TSU or the TPD's records bureau. Those three incidents concerned Ian Alevizon, Dreamlyn Williams, and Rodney Collazo. (*See* Doc. 1-1 at 82.) Most of the other incidents involved complaints of discrimination, for which the City could likely point to many similar incidents over the same twenty years where retaliation did not occur.

First Amendment protected activity. (Doc. 14 at 7.) In support, Defendants cite, *inter alia*,[8] *Connick v. Thompson*, 563 U.S. 51 (2011), wherein the Supreme Court held "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 61 (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). But in *Connick*, the Supreme Court reasoned this standard was necessary specifically under the failure-to-train exception to show policymakers were "on notice that specific training was necessary to avoid this constitutional violation." *See id.* at 62–63 (finding examples of prior *Brady* violations "inadequate with respect to the sort of *Brady* violation at issue here" because "[n]one of those cases [similarly] involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind").

Here, evidence of prior retaliation after public employees made protected complaints[9] can conceivably show a pattern of First Amendment violations—even if such retaliation is separately actionable under statutes like Title VII or the ADEA. *See Stilwell v. City of Williams*, 831 F.3d 1234, 1244 (9th Cir. 2016) (noting "a § 1983 remedy is not precluded" when "a statute merely recognizes a [constitutional right] or adds enforcement options" and "the statute's rights and protections diverge in 'significant ways' from those provided by the Constitution" (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 252–53 (2009))); *see also Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir. 2004) (reports of "[u]nlawful conduct by a government employee or illegal activity within a government agency [even if it also involves a personnel dispute] is a matter of public concern").

But even assuming each of the alleged incidents shows the City retaliated against

---

[8] The other cases cited by Defendants—*Starr*, 652 F.3d at 1216; and *Trevino*, 99 F.3d at 918—do not address the level of similarity required to establish a pervasive practice or custom.

[9] Defendants assume "without admitting" that Plaintiff's internal complaints were in fact protected speech. (Doc. 10 at 3 n.1.) Because Plaintiff was a public employee reporting obstructions to officer support and public transparency, his internal complaints were likely protected speech on a matter of public concern. *See Brownfield v. City of Yakima*, 612 F.3d 1140, 1148 (9th Cir. 2010).

an employee for protected speech,[10] together they appear to be mere "isolated or sporadic incidents" insufficient to establish an improper custom. *See Trevino*, 99 F.3d at 918. A series of fifteen incidents across nearly two decades is surely of "sufficient duration," but lacks the "frequency and consistency" to show the City's retaliation against employees who make protected complaints "has become a traditional method of carrying out policy." *See id.*

### b. Failure to Train, Supervise, or Discipline

As previously noted, the failure to train, supervise, or discipline exception requires Plaintiff to establish the City's "deliberate indifference"—its "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees." *Connick*, 563 U.S. at 62. Deliberate indifference is a "stringent standard of fault" that ordinarily requires a plaintiff to show "[a] pattern of similar constitutional violations" by untrained, unsupervised, or undisciplined employees.[11] *See id.* at 61–62.

In *Connick*, the Supreme Court stressed the level of similarity required: while the plaintiff had pointed to other *Brady* violations, none similarly involved a failure to disclose physical or scientific evidence. *See id.* Here, the fifteen alleged First Amendment violations against City employees over roughly two decades are not similar enough to show the City knew or should have known such conduct was recurring due to a particular deficiency in its training, supervision, or discipline.

There could be a sufficiently similar pattern of unconstitutional conduct when looking solely at the alleged incidents involving other employees within the TSU who were retaliated against after making protected complaints about mismanagement. However, the

---

[10] Notably, for two of the incidents cited by Plaintiff, the City ultimately prevailed against the claims of retaliation. *See Carroll v. City of Tempe*, No. 2:10–cv–01425 JWS, 2010 WL 5343311 (D. Ariz. Dec. 22, 2010); *Matthews v. City of Tempe*, No. CV-22-00407-PHX-SPL, 2023 WL 6880652 (D. Ariz. Oct. 18, 2023).

[11] This case does not seem to involve the "narrow range of circumstances" in which a "a pattern of similar violations might not be necessary to show deliberate indifference." *Connick*, 563 U.S. at 63 (quoting *Bryan Cnty.*, 520 U.S. at 409). In *Canton v. Harris*, 489 U.S. 378, 390 & n.10 (1989), the Supreme Court noted "the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force."

FAC provides too few details by which to truly compare these events and establish the City's deliberate indifference to a pattern of similar constitutional violations by undisciplined or unsupervised employees. Moreover, to plead a constitutional violation against himself, Plaintiff must still allege nonconclusory facts that plausibly show Kim, Price, or other retaliators knew of Plaintiff's protected complaints and acted with retaliatory intent.

### c. Decision or Act by Final Policymaker

Plaintiff argues the City of Tempe is liable because Defendant Inchausti, as the City Manager and final policymaker, "made the *decision* to ignore and disregard both the police department problems Chiaro reported and the adverse employment actions he suffered for such reports." (Doc. 13 at 8.) The Court disagrees. This basis for municipal liability under *Monell* requires "an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019); *see Williams*, 112 F.4th at 646. In other words, under this exception, Plaintiff must allege a decision or act by Defendant Inchausti that *caused* a constitutional injury, not that Inchausti decided to ignore a constitutional injury, which is more properly characterized as a failure to supervise or discipline.

Based on the foregoing, Count One of the FAC fails to state a *Monell* claim against the City. Because the pleading might be cured by the allegation of other facts, the Court will dismiss Count One against the City of Tempe with leave to amend. *See Lopez*, 203 F.3d at 1130.

### B. Count Two – Defendant Hernandez

In Count Two of the FAC, Plaintiff asserts a § 1983 due process claim against Defendant Hernandez for an allegedly false statement in Plaintiff's peace officer termination report regarding misconduct involved in Plaintiff's termination.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This clause "'protects individuals against two types of government

action': violations of substantive due process and procedural due process." *United States v. Quintero*, 995 F.3d 1044, 1051 (9th Cir. 2021) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)).[12]

To state a § 1983 procedural due process claim, a plaintiff must show (1) an individual acting under the color of state law (2) deprived him of a protected liberty or property interest (3) without receiving the process he was constitutionally due. *Levine v. City of Alameda*, 525 F.3d 903, 905 (9th Cir. 2008) (first citing *Lopez v. Dep't of Health Servs.*, 939 F.2d 881, 883 (9th Cir. 1991); and then citing *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 331 (9th Cir. 1995)). Damage to reputation alone is not sufficient to implicate due process protections. *See Paul v. Davis*, 424 U.S. 693, 706 (1976). However, a plaintiff may state a "stigma-plus" due process claim by further showing "(1) the public disclosure of a stigmatizing statement by the government; (2) the accuracy of which is contested; (3) *plus* the denial of 'some more tangible interest such as employment.'" *Chaudhry v. Aragón*, 68 F.4th 1161, 1170 (9th Cir. 2023) (citation modified) (quoting *Ulrich*, 308 F.3d at 982).

Defendants do not dispute Hernandez was acting under the color of state law nor that Plaintiff's public employment qualifies as a protected property interest.[13] Rather, Defendants argue Plaintiff was not "deprived" of any interest in his employment because his retirement was voluntary and not compelled by Hernandez's investigation. Moreover, Defendants note that had Plaintiff not retired, Assistant Chief Sweig determined the

---

[12] As a threshold matter, Plaintiff fails to specify whether Count Two states both a procedural and a substantive due process claim. A substantive due process claim requires Plaintiff to allege a state action that infringed a fundamental right or shocks the conscience. *Regino v. Staley*, 133 F.4th 951, 959–60, 960 n.5 (9th Cir. 2025). Plaintiff fails to cite—and the Court is unaware of—any cases establishing his asserted liberty interest in employment is a fundamental right. *Cf. Hicklin v. Orbeck*, 437 U.S. 518, 524 (1978) (noting the Privileges and Immunities Clause of the U.S. Constitution protects from "state discrimination *against nonresidents* seeking to ply their trade, practice their occupation, or pursue a common calling with the State" (emphasis added)). Also, even if a fundamental right is implicated, the allegations against Defendant Hernandez seemingly do not rise to the level of shocking the conscience.

[13] In the FAC and his Response to Defendant's Motion to Dismiss, Plaintiff bases Count Two solely on an alleged deprivation of a protected *liberty* interest given the stigmatizing charge impacting his ability to find subsequent employment, rather than a deprivation of a protected *property* interest in his employment with TPD. The Court thus analyzes Count Two solely as a stigma-plus claim.

appropriate disciplinary action would have been two written reprimands, not termination. In response, Plaintiff notes he doesn't assert a property interest in his employment with TDP; rather, his stigma-plus claim asserts a "liberty interest in employment [that] arises when a government charge damages seriously one's standing and associations in the community . . . foreclosing his freedom to pursue other employment opportunities." (Doc. 13 at 15) (quoting *Roley v. Pierce Cnty. Fire Prot. Dist. No. 4*, 869 F.2d 491, 495 (9th Cir. 1989) (citations omitted)). Furthermore, Plaintiff asserts the Ninth Circuit's requirement for stigma-plus claims that a stigmatizing charge be made "in the termination context" is broad enough to include a retirement, and that more recent cases do not limit stigma-plus claims to the involuntary termination context.

The Court finds stigma-plus claims are not limited to situations where an employee has been involuntarily terminated. Although much of the caselaw in this area has been in the context of involuntary terminations, some courts have extended stigma-plus claims to other disciplinary actions involving public disclosure of stigmatizing information. *See, e.g.*, *Kivlin v. City of Bellevue*, No. C20-0790 RSM, 2021 WL 5140260, at *9 (W.D. Wash. Nov. 4, 2021). *Compare, e.g.*, *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1179 (9th Cir. 1998) (requiring the stigmatizing charge "be made in connection with termination of employment"), *with Chaudhry*, 68 F.4th at 1170 n.15 (requiring the stigmatizing charge either to have been made "*in connection with* the deprivation of a federally protected right" or to have "*caused* the denial of a federally protected right" (quoting *Hart v. Parks*, 450 F.3d 1059 (9th Cir. 2006))). Indeed, it makes little conceptual sense to limit stigma-plus claims only to the involuntary termination context because the relevant interest is not a property interest in continued employment but rather the employee's "constitutionally based liberty interest in clearing his name when stigmatizing information regarding the reasons for the termination [or other discipline] is publicly disclosed." *See Cox v. Roskelley*, 359 F.3d 1105, 1110 (9th Cir. 2004) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972)); *see also Stiesberg v. California*, 80 F.3d 353, 357 (9th Cir. 1996) ("An individual has a liberty interest in employment protected by the Due Process Clause if the

[personnel action] is for reasons that might seriously damage his standing in the community, or if [it] effectively precludes future work in the individual's chosen profession." (quoting *Merritt v. Mackey*, 827 F.2d 1368, 1373 (9th Cir. 1987))).

Here, however, even if Plaintiff has pled the additional elements for a stigma-plus claim,[14] Plaintiff has not alleged he was deprived of due process. A procedural due process violation requires some denial of fair procedures under the circumstances. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). When the government severely disciplines or terminates a public employee with a protected property interest in their employment, such as tenure or for-cause removal protection, the employee is entitled to a pre-disciplinary or pre-termination hearing. *See, e.g., id.* When the government terminates or fails to rehire a public employee with no protected property interest in employment (e.g., probationary), and the government's action was accompanied by a sufficiently stigmatizing public charge, the employee is entitled to a hearing to contest the charge. *See Ulrich*, 308 F.3d at 982. This is the quintessential stigma-plus claim. But here, where a public employee voluntarily retires, and the government publishes a stigmatizing charge alongside the retirement, Plaintiff fails to establish what procedures—if any—the employee is entitled to.

Plaintiff received fair notice of the misconduct investigation. Had Plaintiff remained at TPD, he likely would've been entitled to a hearing before any serious discipline (such as involuntary termination) could be imposed. After Plaintiff retired, AZPOST evidently did not find the reported misconduct was worthy of any disciplinary action—but if AZPOST thought it may warrant Plaintiff's decertification as a peace officer, this would implicate Plaintiff's protected property interest in his certification and entitle him to notice

---

[14] It appears Plaintiff has sufficiently pled these three additional elements: (1) the misconduct allegations were publicly disclosed; (2) Plaintiff contests the accuracy of the allegations; and (3) the stigmatizing charge resulted in the denial of a tangible liberty interest in employment.

- 14 -

and a hearing. And Plaintiff does not suggest—as it could be unreasonable to—that every misconduct report to AZPOST triggers procedural due process protections and requires an opportunity to be heard.

In similar circumstances, some lower courts have held that a plaintiff cannot state a procedural due process violation because they voluntarily terminated their employment, and they also cannot state a substantive due process violation unless they requested and were denied a name-clearing hearing. "Although the Ninth Circuit has not addressed the issue, district courts in this Circuit have dismissed [] due process violations based on reputational injury for plaintiffs who failed to request a name-clearing hearing." *Kivlin*, 2021 WL 5140260, at *9 ("Here, Kivlin chose to resign rather than proceed through the for-cause termination process, which would have included the *Loudermill* hearing, and he has not raised a material dispute of fact that he requested a separate name-clearing hearing."). Although the Court does not expressly adopt this reasoning here, it too would suggest Plaintiff has not alleged a due process violation. Rather, he alleges a false statement was published with malice and caused him reputational injury in the form of two lost job opportunities—in other words, a defamation claim. And the Supreme Court has consistently warned judges to carefully delineate mere tortious injuries from constitutional ones, lest litigants use § 1983 to turn the Due Process Clause into "a font of tort law to be superimposed upon whatever systems may already be administered by the States." *See Paul*, 424 U.S. at 701.

Thus, as a matter of law Plaintiff has not alleged Hernandez deprived him of his constitutionally based liberty interest in employment and clearing his name without due process. Count Two against Defendant Hernandez fails, but the Court will dismiss it with leave to amend as the allegation of other facts and legal authority might cure these deficiencies. *See Lopez*, 203 F.3d at 1130.

### IV.   CONCLUSION

Count One of the FAC fails to state a § 1983 First Amendment retaliation claim against Defendants Inchausti and the City of Tempe, and Count Two fails to state a § 1983

due process claim against Defendant Hernandez.

Accordingly,

**IT IS ORDERED** Defendant's Motion to Dismiss (Doc. 10) is **GRANTED.** Counts One and Two of Plaintiff's First Amended Complaint are **DISMISSED WITH LEAVE TO AMEND.** If Plaintiff chooses to amend, he must file his amended complaint within fourteen days of this Order and Defendants shall respond to that complaint by the deadline required by the Federal Rules of Civil Procedure.

**IT IS FURTHER ORDERED** Plaintiff's Inquiry Re: Status of Motion Under Advisement (Doc. 17) is **DENIED AS MOOT**.

Dated this 24th day of February, 2026.

Honorable Roslyn O. Silver
Senior United States District Judge